**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN CENTER FOR LAW AND JUSTICE**, | |
| Plaintiff, | |
| v. | Case No. 1:17-cv-01425 (TNM) |
| **U.S. NATIONAL SECURITY AGENCY, *et al.*,** | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

We all wear masks now, but this case is about a different type of masking.  By law, intelligence agencies focus their surveillance on foreign persons and cannot intentionally target U.S. persons without individualized court orders.  *See* 50 U.S.C. §§ 1881a, 1881b, 1881c.  But even when surveilling appropriate targets, they sometimes incidentally capture information about U.S. persons.  Intelligence reports typically "mask" the identities of these persons by using generic references such as "U.S. Person 1."

An "unmasking" request is a formal request to reveal the identity of an anonymized person.  Unmasking is subject to strict limitations, and only certain high-ranking officials can authorize these requests.  *See id.* §§ 1181a(e), 1801(h), 1821(4); Mot. Hr'g Tr. at 4–5.[1]  As one might expect, this procedure is highly controversial when a government official seeks the unmasking of a political rival.

---

[1] *See also* Office of the Dir. of Nat'l Intelligence, Intelligence Cmty. Policy Guidance 107.1, Requests for Identities of U.S. Persons in Disseminated Intelligence Reports (Jan. 11, 2018), https://www.dni.gov/files/documents/ICPG/ICPG-107.1.pdf.

In 2017, media reports surfaced that members of President Trump's campaign and transition team had been caught up incidentally in surveillance by U.S. intelligence agencies. The reports suggested that officials in the outgoing Obama Administration had unmasked these individuals. Citing these reports, the American Center for Law and Justice ("ACLJ") submitted requests under the Freedom of Information Act ("FOIA") to the National Security Agency and the State Department, seeking records related to the alleged unmasking requests.

Both agencies refused to confirm or deny the existence of records responsive to most of ACLJ's requests. As to the rest, the NSA's search yielded no records and State's search yielded several records withheld in full or in part. ACLJ challenges some aspects of this response, and the matter is before the Court on cross-motions for summary judgment. Both motions will be granted in part and denied in part.

## I.

In April 2017, Fox News reported that members of the Trump campaign and transition team had been targeted by U.S. Government surveillance activities.[2] According to the report, Susan Rice, National Security Advisor under President Obama, requested the unmasking of these individuals.

Citing this report, ACLJ sent a three-part FOIA request to the NSA. NSA Compl. Ex. A at 1–3, ECF No. 1-1.[3] The request names Rice and four other senior officials in the Obama

[2] *Susan Rice requested to unmask names of Trump transition officials, sources say*, Fox News (Apr. 3, 2017), https://www.foxnews.com/politics/susan-rice-requested-to-unmask-names-of-trump-transition-officials-sources-say.

[3] All page citations refer to the page numbers that the CM/ECF system generates. There are two Complaints because ACLJ filed two separate actions—one for each FOIA request. The "NSA Complaint" is on the docket for No. 17-cv-1425, and the "State Complaint" is on the docket for No. 17-cv-1991. Early on, the Court consolidated the two, and all filings after this consolidation are on the docket for No. 17-cv-1425. *See* Min. Order (Dec. 20, 2017).

Administration:  Cheryl Mills, Chief of Staff to the Secretary of State; Valerie Jarrett, Senior

Advisor to the President; Loretta Lynch, Attorney General; and Ben Rhodes, Deputy National

Security Advisor.  *Id.* at 4.  Part 1 seeks

> All records . . . where one communicant was Susan Rice, Cheryl Mills, Valerie Jarrett,
> Loretta Lynch, or Ben Rhodes, and another communicant was the Director of the
> [NSA] . . . or any other NSA official or employee . . . regarding . . . communication[s],
> request[s] . . . whereby [Rice, Mills, Jarrett, Lynch, or Rhodes] sought access
> to . . . SIGINT reports or other intelligence products or reports containing the name(s) or
> any personal identifying information related to . . . Donald Trump [and 46 other specified
> individuals.]

*Id.* at 4–5.  Part 2, using similar language, targets any communications from the five Obama

Administration officials requesting the unmasking of Trump or the same 46 others.  *Id.* at 5–7.[4]

And Part 3 more generally seeks any communications between the five officials and the NSA

referencing Trump or the 46 others.  *Id.* at 7–8.  For all three parts, the requested timeframe is

"January 20, 2016, to January 20, 2017"—the final year of the Obama Administration.  *Id.* at 3.

Invoking Exemptions 1 and 3 of FOIA, the NSA refused to confirm or deny the existence

of records responsive to Parts 1 and 2 of ACLJ's request.  Kiyosaki Decl. Ex. B at 24–25, ECF

No. 37-1.  And it found no records responsive to Part 3.  *Id.* at 25.  All told, ACLJ's FOIA

request to the NSA has yielded not one document.  ACLJ challenges the NSA's refusal to

confirm or deny the existence of records responsive to Parts 1 and 2 and the adequacy of the

agency's search as to Part 3.  Pl.'s Cross-Mot. at 5–10, ECF No. 39.

Later in 2017, ACLJ sent a similar, six-part FOIA request to the State Department.  State

Compl. Ex. A, ECF No. 1-1 (17-cv-1991).  It cited a report that Samantha Power, President

Obama's Ambassador to the United Nations, had requested the unmasking of individuals

---

[4]  Part 2 originally was not limited to Trump and the 46 others, but ACLJ later agreed to narrow
Part 2 in this way.  *See* Kiyosaki Decl. ¶ 12, ECF No. 37-1.

associated with the Trump transition team.  *Id.* at 2.[5]  Parts 1, 2, 4, and 5 seek records related to requests Power made to unmask any of the 47 individuals named in the NSA request.  *See id*. at 4–11.[6]  These four parts concern intelligence-related materials, as they target Power's attempts to access "SIGINT reports or other intelligence products or reports."  *Id.*

Parts 3 and 6, meanwhile, more generally seek any communications sent or received by Power referencing Trump or the 46 others.  *Id.* at 7–8, 11; *see* Stein Decl. ¶ 6, ECF No. 37-3. For all six parts, the requested timeframe is "January 20, 2016, to January 20, 2017"—the same timeframe as with the NSA request.  State Compl. Ex. A at 3.

Invoking FOIA Exemptions 1 and 3, State refused to confirm or deny the existence of records responsive to Parts 1, 2, 4, and 5 of ACLJ's request.  Redmond Decl. Ex. B at 26, ECF No. 37-2.  In response to Parts 3 and 6, as narrowed, State released 243 records in whole or in part and withheld nine documents in full.  Stein Decl. ¶ 12.

ACLJ was unsatisfied.  It challenges State's refusal to confirm or deny the existence of records responsive to Parts 1, 2, 4, and 5.  Pl.'s Cross-Mot. at 5–8.  It also challenges State's decision to withhold portions of 15 documents under Exemption 5 of FOIA.  *Id.* at 10–16.

ACLJ does not challenge the adequacy of State's search for records responsive to Parts 3 and 6.  And though it raised a "pattern, practice, or policy" claim, *see* State Compl. ¶¶ 64–77, ECF No. 1 (17-cv-1991), its summary judgment briefing never mentions this claim, so the Court considers it abandoned.  *See, e.g.*, *Noble Energy, Inc. v. Salazar*, 691 F. Supp. 2d 14, 23 n.6

---

[5]  Adam Kredo, *Former U.N. Amb. Power Unmasked 'Hundreds' in Final Year of Obama Admin*, Free Beacon (Aug. 2, 2017), https://freebeacon.com/national-security/former-u-n-amb-power-unmasked-hundreds-last-year-obama-admin/.

[6]  Parts 2, 4, and 5 were originally not limited to Trump and the 46 others, but ACLJ later agreed to this narrowed scope.  *See* Redmond Decl. ¶ 7, ECF No. 37-2.  It is this narrowed scope that is relevant here.  *See DeFraia v. CIA*, 311 F. Supp. 3d 42, 47 (D.D.C. 2018).

(D.D.C. 2010); *accord Aliotta v. Bair*, 614 F.3d 556, 562 (D.C. Cir. 2010) ("[P]laintiffs cannot raise on appeal claims they allege in their complaint but abandon at the summary judgment stage."); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived.").

The Court held a hearing on the parties' cross-motions and they are ripe for disposition.[7]

## II.

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up). The Court views the evidence "in the light most favorable to the non-moving party." *Brubaker v. Metro. Life Ins. Co.*, 482 F.3d 586, 588 (D.C. Cir. 2007).

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). An agency must establish beyond material doubt that it has conducted an adequate search—one reasonably calculated to uncover all relevant documents. *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007). If the agency withholds records under one of the FOIA exemptions, it "bears the burden of proving the

---

[7] In its reply brief, ACLJ made new arguments based on events that took place in May 2020, after the Government filed its combined reply and opposition brief. Pl.'s Reply at 4–11, ECF No. 43; *see infra* Section III.A. The Court permitted the Government to respond to the new arguments, and it did so. Min. Order (May 22, 2020); *see* Defs.' Sur-Reply, ECF No. 44. ACLJ had an opportunity at the hearing to address the Government's sur-reply. *See* Mot. Hr'g Tr. at 26–39.

applicability of [the] claimed exemptions." *ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).

"[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears logical or

plausible." *Id.* (cleaned up).  The agency must also produce any "reasonably segregable portion

of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).

To meet its burden, an agency may rely on affidavits, *Aguiar v. DEA*, 865 F.3d 730, 734–

35 (D.C. Cir. 2017), which receive "a presumption of good faith," *SafeCard Servs., Inc. v. SEC*,

926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court may grant summary judgment based on the

agency's affidavits alone "if they contain reasonable specificity of detail rather than merely

conclusory statements, and if they are not called into question by contradictory evidence in the

record or by evidence of agency bad faith."  *Aguiar*, 865 F.3d at 734–35 (cleaned up).

### III.

The parties' cross-motions for summary judgment present three issues:  (1) whether the

NSA and State properly refuse to confirm or deny the existence of certain documents; (2)

whether the NSA's search for records was adequate; and (3) whether State properly withheld

portions of 15 documents under Exemption 5 of FOIA.  In brief, the Court finds that State

improperly refuses to confirm the existence of some documents, that the NSA's search was

partially inadequate, and that State's Exemption 5 withholdings were proper.

### A.

In response to ACLJ's FOIA requests, the NSA and State both refuse to confirm or deny

the existence of intelligence-related records.  This refusal is known as a *Glomar* response.[8]

---

[8]  The name derives from the CIA's refusal to confirm or deny whether it had records about
Howard Hughes's *Glomar Explorer*, a ship reportedly used to recover a sunken Soviet
submarine.  *ACLU v. CIA*, 710 F.3d 422, 426 n.1 (D.C. Cir. 2013).

The general rule under FOIA is that agencies "must acknowledge the existence of information responsive to a . . . request" and then either release the information or explain why an exemption justifies withholding it. *Roth v. DOJ*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). But sometimes even admitting the *existence* of records implicates an exemption. If an exemption prevents an agency from acknowledging the existence of records, it can refuse to confirm or deny their existence—a *Glomar* response. *EPIC v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012).

When an agency invokes a FOIA exemption to support a *Glomar* response, the same general standard of review applies: the agency's affidavit must be reasonably specific and the justification for invoking the exemption must appear logical or plausible. *Id.* When agencies assert *Glomar* responses in the interest of national security, as commonly happens, they get a healthy dose of deference. *See Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) ("[I]n the context of national security concerns, courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." (cleaned up)).

Unsurprisingly, there are caveats to the *Glomar* doctrine. One is that an agency cannot refuse to confirm or deny the existence of records if it has, in fact, officially acknowledged their existence. A plaintiff "can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect." *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013). The plaintiff has the burden of pointing to an official disclosure in the public domain that establishes the existence (or not) of responsive records. *Id.*

This point bears emphasis: the question is whether the agency has acknowledged the *existence* (or nonexistence) of responsive records, *not* whether it has disclosed the *contents* of the records. *Id.* If the agency has officially acknowledged the existence of records, it cannot assert a

*Glomar* response for those records.  *Wolf*, 473 F.3d at 379.  Bereft of its *Glomar* shield, the agency has a decision to make, the same one it has in any standard FOIA case:  either disclose the records or establish that their *contents* are exempt from disclosure.  *See id*. at 379–80.

Here, the NSA asserts *Glomar* responses for Parts 1 and 2 of ACLJ's request to it, and State asserts *Glomar* responses for Parts 1, 2, 4, and 5 of ACLJ's request to it.  All these parts seek records related to alleged requests by Obama Administration officials to access intelligence reports.  In refusing to confirm or deny the existence of such records, both agencies rely on FOIA Exemptions 1 and 3.

Exemption 1 protects matters "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Both agencies invoke Executive Order 13,526, which authorizes the classification of information about intelligence activities, sources, and methods.  Exec. Order No. 13,526, § 1.4(c), 75 Fed. Reg. 707 (Dec. 29, 2009).  Their affidavits adequately detail why "the fact of the existence or nonexistence" of responsive records is properly classified under this Executive Order.  Kiyosaki Decl. ¶¶ 15–22, ECF No. 37-1; Redmond Decl. ¶¶ 9–21, ECF No. 37-2.

Exemption 3 covers matters "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  Both agencies cite 50 U.S.C. § 3024(i)(1), and the NSA also relies on 50 U.S.C. § 3605 and 18 U.S.C. § 798.  The agencies' declarations adequately explain why "the fact of the existence or nonexistence" of responsive records is exempt from disclosure under these statutes. Kiyosaki Decl. ¶¶ 23–28; Redmond Decl. ¶¶ 22–23.

The Court need not discuss Exemptions 1 and 3 further, because ACLJ does not challenge either agency's reliance on these exemptions.  Instead, it contends that both agencies

have waived their *Glomar* responses by officially acknowledging the existence of responsive records.  Pl.'s Cross-Mot. at 5–8.

In support of this argument, ACLJ first points to statements that Obama Administration officials made *after* leaving office.  *See id*. at 4, 7–8; Pl.'s Statement of Add. Material Facts ("PSAMF") ¶¶ 24–28, ECF No. 39-1.  By relying on these statements, ACLJ invites the Court to accept that statements made by former agency officials can constitute the sort of "official acknowledgment" that overcomes a *Glomar* response.

The Court declines this invitation.  A "disclosure made by someone other than the agency from which the information is being sought" is not an "official" disclosure.  *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999).  The D.C. Circuit has "squarely rejected the argument that statements in books written by former [CIA] agents could be considered *official* disclosures." *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201–02 (D.C. Cir. 1993).  Courts have consistently found that statements by former agency officials are not official agency disclosures.  *See Hudson v. River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421–22 (2d Cir. 1989); *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 27–28 (D.D.C. 2018).

ACLJ cites no decision to the contrary, which is unsurprising.  It would be surpassing strange if an agency had to confirm the existence of records—and in doing so, compromise national security—simply because a private citizen no longer representing the agency forces its hand.

ACLJ also suggests that members of Congress can waive *Glomar* responses.  *See* Pl.'s Cross-Mot. at 8.  But disclosures by members of Congress—much like disclosures by former agency officials—are also not official agency disclosures.  *See Frugone*, 169 F.3d at 774; *accord Schaerr v. DOJ*, 435 F. Supp. 3d 99, 118 (D.D.C. 2020) ("Congressman Nunes serves in the

legislature, not the executive branch, and does not speak for the agency."). A contrary rule would almost certainly raise significant constitutional problems, as this would invite congressional encroachment on the Executive's authority to control access to national security information. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765–66 (D.C. Cir. 1990).

By citing press reports on the alleged unmasking requests, *see* PSAMF ¶¶ 24–28, ACLJ suggests that the media can waive *Glomar* responses. Not so. *See EPIC*, 678 F.3d at 933 n.5; *Knight First Amendment Inst. v. CIA*, 424 F. Supp. 3d 36, 44 (D.D.C. 2020). ACLJ also posits that "[f]or purposes of overcoming a *Glomar* response . . . [w]hat is important is that [the fact of unmasking requests] is now widely known." Pl.'s Cross-Mot. at 8. Again, ACLJ is mistaken. *See Wolf*, 473 F.3d at 378 ("An agency's official acknowledgment of information by prior disclosure . . . cannot be based on mere public speculation, no matter how widespread.").

Perhaps recognizing the weakness of these arguments, ACLJ tries a different tack in its reply brief. *See* Pl.'s Reply at 3–4, ECF No. 43. It urges that two recent disclosures overcome the agencies' *Glomar* responses. *Id.* at 4–11.[9] Here, matters become more complicated.

### 1.

The first disclosure comes from then-Acting Director of National Intelligence ("DNI") Richard Grenell. On May 4, 2020, the NSA issued a memorandum "pursuant to the oversight authorities vested with the [DNI]" that provides "a revised list of identities of any officials who submitted requests to the [NSA] at any point between 8 November 2016 and 31 January 2017, to unmask the identity of former National Security Advisor, Lieutenant General Michael T. Flynn

---

[9] Though ACLJ makes this argument for the first time in its reply brief, that is appropriate here because the relevant disclosures occurred in May 2020, after ACLJ submitted its first brief. In responding to ACLJ's reply brief, the Government tackles the new argument on the merits and does not contend that ACLJ forfeited it. *See* Defs.' Sur-Reply at 1–6.

(USA-Ret.)."  Sisney Decl. Ex. 2 at 5, ECF No. 43-1.  Samantha Power is among the listed

officials.  *Id.* at 6.  Grenell declassified the memorandum shortly after it was issued and sent it to

two Senators.  *Id.* at 4; Sisney Decl. ¶¶ 2–3.

    In its briefing, the Government acknowledged that this disclosure can in theory waive the

NSA's *Glomar* responses, though it suggested that a DNI's disclosure can *never* waive State's

*Glomar* responses.  *See* Defs.' Sur-Reply at 2–3, ECF No. 44.  But at oral argument, the

Government changed course on the latter point, conceding that the DNI's disclosure *can* vitiate

the intelligence-related *Glomar* responses that State asserts here.  Mot. Hr'g Tr. at 10.[10]  The

only question now is whether the Acting DNI's disclosure here *does* overcome State's (or the

NSA's) *Glomar* responses.  Answering this requires close attention to exactly what the

declassified memorandum discloses, for a *Glomar* waiver occurs only when the official

disclosure "matches . . . the specific request for that information."  *Wolf*, 473 F.3d at 379.

    On this issue, both parties stake out absolute positions.  The Government contends that

the relevant disclosure is not specific enough to establish the existence of *any* records responsive

to ACLJ's requests.  *See* Defs.' Sur-Reply at 2–4.  ACLJ, meanwhile, urges that the disclosure

establishes the existence of at least *some* records responsive to the State request, and it suggests

that this waives *all* of State's (and the NSA's) *Glomar* responses.  *See* Pl.'s Reply at 7–8.  The

---

[10]  The Court agrees with the Government's concession.  One agency's disclosure generally
cannot vitiate the *Glomar* response of an unrelated agency, but that rule "does not
apply . . . where the disclosures are made by an authorized representative of the agency's
parent."  *ACLU*, 710 F.3d at 429 n.7.  The DNI is State's "parent" for purposes of its *Glomar*
responses.  The State Department office tasked with substantiating the agency's *Glomar*
responses was the Bureau of Intelligence and Research ("INR"), *see* Redmond Decl. ¶¶ 1, 5, 8, a
member of the U.S. Intelligence Community, 50 U.S.C. § 3003(4)(I).  The DNI "serve[s] as head
of the [I]ntelligence [C]ommunity," *id.* § 3023(b)(1), and the INR reports to the DNI, *see*
Redmond Decl. ¶ 2.  Given the DNI's "parent" status, its disclosures are "official
acknowledgments" across all subordinate intelligence units, including the INR.  *See Knight First
Amendment Inst.*, 424 F. Supp. 3d at 42–44.

Court rejects both positions:  the disclosure is specific enough to establish the existence of *some* responsive records, but it waives State's *Glomar* responses for those records only and waives none of the NSA's *Glomar* responses.

The case law demands precision when analyzing the scope of a *Glomar* waiver.  "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."  *Wolf*, 473 F.3d at 378.  This "insistence on exactitude" honors "the Government's vital interest in information relating to national security."  *Id.* (cleaned up).  Indeed, "the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations."  *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990).

The message is clear:  hold agencies to their official disclosures but be precise, lest courts force them to release sensitive information they have not actually disclosed.  The D.C. Circuit thus has consistently rejected the "claim that public disclosure of *some* information overlapping with [the] content of requested material results in waiver as to *all* information."  *Wolf*, 473 F.3d at 378 (emphasis added) (citing *Military Audit Project v. Casey*, 656 F.2d 724, 752–53 (D.C. Cir. 1981)); *see also Pub. Citizen*, 11 F.3d at 202–03; *Fitzgibbon*, 911 F.2d at 765–66.

Consider *Wolf*.  The plaintiff's FOIA request to the CIA in that case sought "all records about Jorge Eliecer Gaitan" (a former Colombian politician), but the agency refused to confirm or deny the existence of such records.  473 F.3d at 378.  To overcome this *Glomar* response, the plaintiff pointed to "CIA Director Hillenkoetter's testimony before the Congress in 1948."  *Id.* at 379.  That testimony revealed the existence of some records about Gaitan.  *Id.*  But—critically— the court did not order the CIA to acknowledge the existence of *all* records it had about Gaitan.  Instead, the court emphasized that "[t]he CIA's official acknowledgement waiver relate[d] only

to the existence or nonexistence of the records about Gaitan disclosed by Hillenkoetter's testimony." *Id.* So the plaintiff was "entitled to disclosure of that information, namely the existence of CIA records about Gaitan that have been previously disclosed (*but not any others*)." *Id.* (emphasis added). The *Glomar* waiver had a narrow and limited scope.

So too here. The declassified memorandum encloses "a list of recipients who may have received [Flynn's] identity in response to a request . . . to unmask an identity that had been generically referred to in an NSA foreign intelligence report." Sisney Decl. Ex. 2 at 6. The list consists of "select identified principals," including Power. *Id.* "[A]uthorized individuals requested unmaskings . . . *for* [these] select identified principals." *Id.* (emphasis added). So the memorandum acknowledges that individuals made requests, on behalf of Power, to unmask Flynn. In doing so, it establishes the existence of records relating to these requests, as the Government concedes. *See* Defs.' Sur-Reply at 3. And even more narrowly, the memorandum lists only six dates on which these requests were made. Sisney Decl. Ex. 2 at 6.

This disclosure is not specific enough to establish the existence of *most* records the Government refuses to acknowledge. The NSA asserts a *Glomar* response for Parts 1 and 2 of ACLJ's FOIA request, which target unmasking requests from Susan Rice, Cheryl Mills, Valerie Jarrett, Loretta Lynch, and Ben Rhodes. NSA Compl. Ex. A at 4–7. The declassified memorandum lists several principals, but *not* Rice, Mills, Jarrett, Lynch, or Rhodes. Sisney Decl Ex. 2 at 6–8. Given the precision the case law demands, this silence "makes a difference." *James Madison Project*, 302 F. Supp. 3d at 31–32 (citing *Wolf*, 473 F.3d at 373–74, 378). The memorandum does not establish the existence of any records of unmasking requests from Rice, Mills, Jarrett, Lynch, or Rhodes, so it fails to overcome the NSA's *Glomar* responses.

The same is true for Parts 4 and 5 of ACLJ's request to State. Both parts seek

> All records . . . regarding in any way . . . *requests from [Power] . . . regarding "minimization procedures"* in connection with . . . requests made by [Power] . . . regarding the "unmasking" of or access to the "unmasked" names or other personal identifying information of [Donald Trump and 46 others] contained in SIGINT reports or other intelligence products or reports[.]

State Compl. Ex. A at 8, 10 (emphasis added).  The declassified memorandum references no "requests from [Power] . . . regarding 'minimization procedures.'"  Sisney Decl. Ex. 2 at 5–8.  So it does not establish the existence of documents responsive to Parts 4 or 5.

Parts 1 and 2 of the State request present a closer question.  Part 1 seeks

> All records . . . *where one communicant was [Power]* . . . and where another communicant was the Director of the [NSA] . . . or any other NSA official or employee . . . which regards in any way . . . any communication, request . . . whereby [Power] sought access to or attempted to access SIGINT reports or other intelligence products or reports containing the name(s) or any personal identifying information related to [Donald Trump and 46 others.]

State Compl. Ex. A at 4–5 (emphasis added).  Part 2, meanwhile, targets

> All records . . . *regarding in any way . . . requests from [Power]* . . . made to the Director of the [NSA] . . . or any other NSA official or employee . . . requesting the "unmasking" of or access to the "unmasked" names or other personal identifying information of [Donald Trump and 46 others] contained in SIGINT reports or other intelligence products or reports[.]

*Id.* at 5–7 (emphasis added).

For both Parts, the Government advances the same argument.  It notes that the declassified memorandum mentions only unmasking requests made "for" Power—that is, on behalf of Power.  *See* Defs.' Sur-Reply at 3.  This, it urges, is not specific enough to establish the existence of records responsive to Parts 1 or 2, because both parts seek only "records in which [Power] was a 'communicant.'"  *Id.*

The Court rejects this argument as to Part 2.  That part is not limited to records in which Power was a "communicant."  It more broadly seeks records "regarding in any way . . .

14

[unmasking] requests from [Power]."  State Compl. Ex. A at 5.  So it comes down to this:  are

unmasking requests made *on behalf of* Power equivalent to unmasking requests *from* Power?

By identifying Power as a "principal," the memorandum itself establishes that she was in

a principal-agent relationship with the "authorized individuals" who made requests "for" her.

Sisney Decl. Ex. 2 at 6.  A defining feature of this sort of relationship is the principal's control

over the agent.  *See, e.g.*, *CIR v. Banks*, 543 U.S. 426, 436 (2005); Restatement (Third) of

Agency § 1.01 (Am. Law. Inst. 2006).  For this reason, the law generally attributes an agent's

actions to the principal when the agent acts within the bounds of his authority.  *See, e.g.*, *Salyers*

*v. Metro. Life Ins. Co.*, 871 F.3d 934, 939 (9th Cir. 2017); Restatement (Third) of Agency § 2

intro. note; *see also McKesson Corp. v. Islamic Rep. of Iran*, 52 F.3d 346, 351–52 (D.C. Cir.

1995) (discussing whether a principal-agent relationship existed and thus whether the actions of

the alleged agent could be attributed to the alleged principal).  And there is no suggestion here

that in making the requests, the "authorized individuals" were acting beyond the scope of their

agency relationship with Power.  So here, the requests from Power's subordinates were requests

*from her*.

This result should be commonsense for anyone who works in a hierarchical organization,

like the government.  A communication "on behalf of the principal" is equivalent to a

communication "from the principal."  Consider some examples close to home.  If a law clerk

emails counsel on behalf of the judge, counsel is well advised to view that email as "from" the

judge, even though the judge did not type the email.  And if an AUSA files a brief, it comes with

the imprimatur of the U.S. Attorney, even if he did not personally review it.

At oral argument, the Government's position on this issue shifted slightly.  It suggested

that the declassified memorandum does not refer to unmasking requests made *on behalf of*

Power.  *See* Mot. Hr'g Tr. at 5–9, 49.  Instead, it suggested, the memorandum refers simply to unmasking requests by individuals whom Power "authorized" at some indeterminate point— perhaps long ago—to make these requests.  *See id.*  And, it speculated, these individuals were making the requests for their own devices and without Power's knowledge.  *See id.*

This shift in argument changes little.  For one, the Government's speculation finds scant support in the memorandum's language.  The only hint that Power's subordinates were making the unmasking requests for their own devices is the memorandum's proviso that the principals may not have personally seen the unmasked information.  *See* Sisney Decl. Ex. 2 at 6.  But that is a thin reed, especially when the memorandum also states that the "authorized individuals" made the unmasking requests "for" the principals.  *Id.*; *see* Defs.' Sur-Reply at 3.  It says nothing about subordinates making the requests for *themselves* or without the principal's knowledge.  In fact, the memorandum's cover page describes the enclosed list as giving the "*identities* of any officials *who submitted requests* . . . to unmask . . . Flynn."  Sisney Decl. Ex. 2 at 5 (emphasis added).  As the list provides only the identities of the principals—not their subordinates—the cover page itself suggests that these unmasking requests were truly *from* the principals, including Power.

And even if the Government's speculation were accurate, this would make no difference.  As noted, there is no suggestion that the "authorized individuals" making the unmasking requests were acting outside the bounds of the authority that Power gave them.  Given that, these requests made "for" Power—the principal—are attributable to her, no matter how long ago she authorized

her agents, no matter if she knew about the requests, and no matter if the agents had personal reasons for making the requests.  *See* Restatement (Third) of Agency §§ 1.01 cmt. f, 3.06, 5.03.[11]

In sum, because the declassified memorandum establishes the existence of records about unmasking requests *from* Power, it waives State's *Glomar* response as to Part 2 of ACLJ's request.  But importantly, the scope of the waiver is narrow.  The memorandum references only requests to unmask Lt. Gen. Michael Flynn, not anyone else.  Given this silence, it does not establish the existence of unmasking records for any of the 46 others named in ACLJ's request.  As discussed, the law demands exactitude when defining the scope of a *Glomar* waiver, even the smallest mismatch precludes waiver.  *See Wolf*, 473 F.3d at 378–79.  As the memorandum never mentions the 46 individuals other than Flynn, it is unavailing for those individuals.  So the *Glomar* waiver for Part 2 extends only to Flynn, not any of the 46 others.

The applicable dates for the waiver are also limited.  In *Fitzgibbon*, for example, the D.C. Circuit "rejected the argument that congressional testimony establishing the existence of a CIA station in the 1960s waived . . . protection of records about the station in the 1950s because the time period specified in the plaintiff's FOIA request did not match the time period of the prior disclosure."  *Id.* at 378 (citing 911 F.2d at 765–66).  Here, the timeframe specified in ACLJ's FOIA request is "January 20, 2016, to January 20, 2017."  State Compl. Ex. A at 3.  The six dates listed under Power's name in the memorandum all fall into that range, *see* Sisney Decl. Ex. 2 at 6, so the unmasking requests made on those six dates are fair game.  But no more than that.

---

[11]  The Government admits that the declassified memorandum would be a match with Part 2 if that part had mentioned unmasking requests "indirectly from" Power, as opposed to requests "directly from" her.  *See* Mot. Hr'g Tr. at 7–8.  Even assuming a meaningful difference exists between "indirectly from" and "directly from" in this context, the Government's admission still effectively concedes the point, for ACLJ did not use the words "directly from."  Rather, Part 2 seeks records "regarding in any way . . . requests *from* [Power]," without limiting itself to requests "directly from" her.  State Compl. Ex. A at 5 (emphasis added).

In other words, the existence of requests made on November 30, December 2, December 7, December 14, December 23 (all in 2016), and January 11, 2017, *id.*, does not establish the existence of unmasking requests made on any other dates.  So the *Glomar* waiver for Part 2 extends only to the unmasking requests made on those six dates.

Consistent with the above, State no longer can assert a *Glomar* response—for Part 2—for records about the unmasking requests referenced in the declassified memorandum.  Here, that means requests made on behalf of Power to unmask Flynn, on the six dates specified in the memorandum.  State now must either turn over these records or else establish that their *contents* are exempt from disclosure.  *See Wolf*, 473 F.3d at 380.

There is a final bit of housekeeping on this point.  The Court need not decide whether the declassified memorandum overcomes any portion of State's *Glomar* response for Part 1 of ACLJ's request.  At oral argument, the parties agreed that the Court need not decide this if it concludes—as it has—that the memorandum overcomes State's *Glomar* response for Part 2.  *See* Mot. Hr'g Tr. at 38 (ACLJ), 53–54 (Government).

## 2.

The other recent disclosure that ACLJ relies on is a transcript of Power's testimony before the House Permanent Select Committee on Intelligence in October 2017.  Pl.'s Reply at 8–11.  Her testimony, standing alone, consists of statements by a *former* official, so it cannot overcome either agency's *Glomar* responses, as explained above.

ACLJ tries to surmount this by claiming the transcript was "declassified by the Intelligence Community."  Pl.'s Corrected Reply at 8, ECF No. 46.  This argument suffers from several problems.  For one, ACLJ provides no evidence that the Intelligence Community declassified the transcript.  Its accompanying declaration states simply that "[o]n May 8, 2020,

the [Committee] released the transcript of the testimony provided by [Power] before the [C]ommittee in Executive Session [in October 2017]."  Sisney Decl. in Corrected Reply Br. ¶ 4, ECF No. 46-1.  And the transcript itself reveals nothing about whether the Intelligence Community declassified it.  Sisney Decl. Ex. 3 at 10–30, ECF No. 43-1.

ACLJ also does not explain *who* in the Intelligence Community declassified it or whether that official or entity enjoys "parent" status relative to the NSA or State.  *See supra* note 10.  Nor does ACLJ seek to explain how declassification of a transcript containing statements by a former agency official might convert those statements into official agency disclosures.  Does declassification mean that the Intelligence Community stands by Power's statements?  We are left to speculate, because ACLJ is silent on all these points.

Recall that the plaintiff has the burden of pointing to an official disclosure in the public domain that overcomes a *Glomar* response.  *ACLU*, 710 F.3d at 427.  Thus, because ACLJ offers no evidence that the transcript represents an official disclosure, it cannot rely on it to overcome any *Glomar* responses.

And even if the transcript were an official disclosure, that still would not help ACLJ.  Nothing that Power states in the transcript is specific enough to establish the existence of any records subject to the agencies' *Glomar* responses.

ACLJ contends that Power admitted making unmasking requests for "persons affiliated with the Trump Campaign and the incoming Trump Administration."  Pl.'s Reply at 11.  That is inaccurate.  Though members of the Committee asked her about unmasking, she never admitted making requests to unmask members of the Trump campaign and transition team, let alone any of the 47 specific individuals named in ACLJ's FOIA requests.  *See* Sisney Decl. Ex. 3 at 10–30.

Indeed, the only individual Power ever mentioned is Michael Flynn, and she claimed to have "no recollection of making a request related to [him]." *Id.* at 21.

Given the precision that the law demands in the *Glomar* context, this transcript—even if it represents an official disclosure—does not overcome either agency's *Glomar* responses.

## B.

The NSA did not assert a *Glomar* response for Part 3 of ACLJ's request, which seeks

> All records . . . created, generated, forwarded, transmitted, sent, shared, saved, received, or reviewed by the Director of the [NSA], the Chief of the Central Security Service, SIGINT production organization personnel, the Signals Intelligence Director, Deputy Signals Intelligence Director, or the Chief/Deputy/Senior Operations Officers of the National Security Operations Center, or any other NSA official or employee, where one communicant was [Rice, Mills, Jarrett, Lynch, or Rhodes] and another communicant was any NSA official or employee, containing any reference to the term "Trump" or names or other personal identifying information of [Donald Trump and 46 others.]

NSA Compl. Ex. A at 7–8.  The agency's search yielded no records responsive to Part 3. Kiyosaki Decl. Ex. B at 25.  ACLJ challenges the adequacy of this search.

To show an adequate search, the agency must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (cleaned up).  The adequacy of a search "is generally determined not by [its] fruits . . . but by the appropriateness of the methods used to carry [it] out." *Iturralde v. Compt. of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

To carry its burden, an agency can submit a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Courts give these affidavits "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc*, 926 F.2d at 1200 (cleaned up).  Searching for records

requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," so it "is hardly an area in which the courts should attempt to [micromanage] the executive branch." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003).

ACLJ raises two objections to the NSA's search.  First, it complains about the agency's decision to search the records of only three NSA officials.  The agency's declaration explains that Part 3 "specifically requested records in which [Rice, Mills, Jarrett, Lynch, or Rhodes] was a direct communicant."  Kiyosaki Decl. ¶ 29.  Because all five occupied "senior positions," only "certain NSA officials—at least one of the Director, the Deputy Director, or the Executive Director—would have received or been copied on *all* direct correspondence between the [NSA] and [the five]."  *Id.*  Thus, the agency searched only the records of the Director, the Deputy Director, and the Executive Director.  *Id.*

ACLJ believes this search was too limited.  Pl.'s Cross-Mot. at 9.  It notes that Part 3 seeks records "sent [and] received" by a host of other NSA employees:  "the Chief of the Central Security Service, SIGINT production organization personnel, the Signals Intelligence Director, Deputy Signals Intelligence Director, [and] the Chief/Deputy/Senior Operations Officers of the National Security Operations Center."  *Id.*  ACLJ demands that the NSA search the records of all these employees too, *id.*, though in reply, it omits any reference to "SIGINT production organization personnel," Pl.'s Reply at 13.  ACLJ also faults the NSA for providing "no citation to a policy or standard practice" supporting a decision to search the records of only three officials.  Pl.'s Cross-Mot. at 9.

The Court disagrees with ACLJ here.  A plaintiff has no authority to dictate the scope of an agency's search.  *See Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015).  While a "well defined" FOIA request may go a long way to expose deficiencies, *see DiBacco v. Dep't of the*

*Army*, 926 F.3d 827, 832 (D.C. Cir. 2019), ACLJ's request was not well defined.  It sought records "sent or received" by all "SIGINT production organization personnel" and, as a catch-all, "any other NSA official or employee."  NSA Compl. Ex. A at 7.  And it defined the term "NSA official" to encompass not only agency employees but also any person "contracted for services by or on behalf of the NSA."  *Id.* at 3.  So if the agency had adhered to ACLJ's proposed scope, it would have searched the records of every NSA employee and contractor.

The agency need not do this, as even ACLJ now concedes.  *See* Pl.'s Reply at 13. ACLJ's reply brief omits any reference to "SIGINT production organization personnel" and "any other NSA official or employee."  *Id.*  In doing so, it admits that the request posed a line-drawing problem for the agency and that drawing the line somewhere short of *all* employees was proper. *See Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986) ("[A]dequacy is measured by the reasonableness of the effort in light of the specific request.").

The NSA drew that line at the Director, the Deputy Director, and the Executive Director, because these officials, it reasoned, would have been copied on any correspondence with the five senior Obama Administration officials that ACLJ named.  Kiyosaki Decl. ¶ 29.  That rationale, supported by an affidavit, *id*., is entitled to a presumption of good faith.  *SafeCard Servs., Inc.*, 926 F.2d at 1200.  And it is eminently reasonable to believe that high-ranking Administration officials would have communicated with their peers at the NSA, not career subordinates.

ACLJ tries to rebut the good-faith presumption only with speculation that responsive records may exist with other officials, *see* Pl.'s Cross-Mot. at 9; Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 5, ECF No. 39-1; Pl.'s Reply at 12–13, but this is not enough.  *SafeCard Servs., Inc.*, 926 F.2d at 1200.  As for ACLJ's suggestion that the NSA had to cite "a policy or standard practice" justifying its decision, Pl.'s Cross-Mot. at 9, no such requirement exists.  To

the contrary, the law recognizes that FOIA searches often involve "case-specific exercises of discretion and administrative judgment and expertise." *Schrecker*, 349 F.3d at 662.

ACLJ's second objection concerns the NSA's initial search terms. Here, ACLJ is on firmer footing. The agency devotes a single sentence to this subject in its declaration, explaining that it "us[ed] various permutations of the officials' names (e.g., susan rice, srice, rice susan) to identify an initial subset of records." Kiyosaki Decl. ¶ 30. That's it.[12]

ACLJ has two problems with this explanation. First, it questions how the NSA's chosen permutations would have captured any records associated with the government email address of Cheryl Mills—MillsCD@state.gov. Pl.'s Cross-Mot. at 9–10 (citing PSAMF ¶ 29).[13] Second, it argues that the agency's initial search terms certainly would not have captured any records associated with an email alias that Loretta Lynch used—"Elizabeth Carlisle." *Id.* (citing PSAMF ¶ 30).

These are related complaints, but there are key differences between them. Two cases illuminate these differences. Consider first *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999), which emphasized an agency's duty "to follow through on obvious leads to discover requested documents." *Id.* at 325. The Coast Guard's own FOIA search revealed that

---

[12] After identifying the "initial subset of records," the agency eliminated "[r]ecords that were outside of the request's time frame." Kiyosaki Decl. ¶ 30. It then identified "records in which one of the officials was a communicant (on the to, from, cc, or bcc line)" and eliminated all others. *Id.* And it reviewed the remaining records to identify those that "contained any reference to any of the 47 listed individuals," finding none. *Id.* ACLJ does not challenge these aspects of the search. *See* Pl.'s Cross-Mot. at 9–10.

[13] ACLJ also questions how the NSA's initial search terms would have found records associated with a personal email address that Mills allegedly used for official communications— Cheryl.mills@gmail.com. Pl.'s Cross-Mot. at 9–10 (citing PSAMF ¶ 29). But the Court finds it clear that at least one of the agency's permutations—"cheryl mills"—would have captured this address. *See* Kiyosaki Decl. ¶ 30.

responsive documents "may be located at [a] federal records center in Georgia," but it inexplicably declined to probe this location. *Id.* at 325, 327. This "positive indication[] of overlooked materials" made the Coast Guard's search inadequate. *Id.* at 327.

At the same time, an agency "is not required to speculate about potential leads." *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996). Kowalczyk sent a request to the FBI's D.C. headquarters, asking for records associated with "Federal case number 88 CR 701." *Id.* at 388. Five months later, he sent an "appeal" letter, which described his original request as one for records associated with "Criminal Case Number 88 CR 701, in the Eastern District of New York." *Id.* He insisted that the FBI should have searched its New York field office, not just its D.C. headquarters, but the Circuit rejected this.

The analysis proceeded in two steps. The court first disregarded the plaintiff's "appeal" letter, which the FBI had received months after it searched for records responsive to the original request. *Id.* Agencies have no "obligation to search anew based upon a subsequent clarification." *Id.* Then, the court found that nothing in the original request (which did not mention New York) or the FBI's search would have enabled the agency to determine that the New York office had responsive records. *Id.* at 389. The FBI might have "speculated" about this potential lead, but an agency "is not obliged to look beyond the four corners of the request for leads." *Id.* And "if the *requester* discovers leads in the documents he receives from the agency, he may pursue those leads through a second FOIA request." *Id.* (emphasis added).

Read together, *Valencia-Lucena* and *Kowalczyk* establish complementary principles. Under *Valencia-Lucena*, an agency must follow clear leads apparent from the FOIA request or that it discovers during its search. But under *Kowalczyk*, an agency is not responsible for leads that it could not have been expected to discover. And an agency need not search anew based on

late-breaking clarifications from a plaintiff; if the plaintiff discovers leads, he can always submit a new FOIA request.

Here, *Valencia-Lucena* governs the issue with Mills's government email and *Kowalczyk* governs the issue with Lynch's alias.  In its FOIA request, ACLJ specifically asked the NSA to search records associated with the government email accounts of the named officials, *see* NSA Compl. Ex. A at 3, 8, and the agency does not seriously dispute that it learned of Mills's government account during its search, *see* Mot. Hr'g Tr. at 12, 15–18, 51–52.  Yet it is far from clear that the agency's initial search terms would have captured any records associated with this account.  The declaration's mere sampling of permutations by "e.g.," *see* Kiyosaki Decl. ¶ 30, does not cut it.  The only permutations it lists, as applied to Mills, are "cheryl mills," "cmills," and "mills cheryl."  *Id.*  Would any of these permutations capture the email address itself (MillsCD@state.gov)?  "MillsCD" (or even just "mills") is not among the listed permutations.  We are left to speculate.  The NSA ultimately admits that it is "not entirely clear from the declaration" whether its search terms would have picked up the address.  *See* Mot. Hr'g Tr. at 16.

The agency suggests that its permutations would have at least yielded emails that Mills signed with her name.  *Id.* at 12–13.  Even if Mills were the rare official who signed all her emails, this still does not fly.  A search for "cheryl mills" might capture emails containing a block signature, but it seemingly would not capture emails containing a one-name signature ("Cheryl") or initials ("CDM").

In short, the NSA was aware of Mills's government email, but it fails to show that it performed a search reasonably calculated to uncover records associated with that address.  This is barely any improvement on *Valencia-Lucena*, in which the agency declined to search a records center in Georgia that it knew likely contained responsive documents.  The NSA's search-term

permutations here leave much to be desired—it's as if the agency went looking for the Georgia records by searching a location in Alabama.  Its search was inadequate in this respect.[14]

Lynch's alias is a different story.  The parties agree on the timeline:  ACLJ sent its FOIA request to the NSA in April 2017, and Lynch's use of the alias was publicly exposed that August.  *Id.* at 41, 50–51.  Unlike with its FOIA request to State in August, ACLJ's FOIA request to the NSA did *not* specifically ask the agency to consider aliases in its search.  *Compare* NSA Compl. Ex. A at 4–8, *with* State Compl. Ex. A at 4–5, 7–8, 10–11.  So for starters, the "four corners" of ACLJ's request did not give the NSA a lead to aliases, for Lynch or anyone else.  *Kowalczyk*, 73 F.3d at 389.

And there is no suggestion that the agency discovered Lynch's use of the alias during its search.  Nor could the Court reasonably expect this.  After all, Lynch was the Attorney General, not an NSA official.  If she had been an NSA employee, a different analysis would apply.  But the inundated staffers in our Nation's FOIA offices cannot be expected to track the use of aliases by officials at different agencies.  ACLJ suggests that Lynch's alias was a major media story when it surfaced, Mot. Hr'g Tr. at 46, but that seems unlikely.  It may have been a juicy bit of news for politicos and pundits, but probably not for FOIA staffers or the rest of America.  And as we know, the D.C. news cycle moves quickly.

---

[14]  ACLJ requests documents in the timeframe of January 20, 2016, to January 20, 2017, NSA Compl. Ex. A. at 3, yet based on public record, Mills left the State Department in 2013.  So it seems possible the NSA will not find any records associated with Mills's government email account in the 2016–2017 timeframe, even if the agency uses a broader range of initial search terms.  But the Government has nowhere offered this line of reasoning as a basis to uphold the adequacy of the NSA's search about Mills.  *See* Defs.' Mot. at 25–26, ECF No. 37; Defs.' Reply at 16–18, ECF No. 41; Mot. Hr'g Tr. at 11–19, 51–52.  The Court will not sua sponte uphold the adequacy of the search on a ground the agency has not proposed.

In *Kowalczyk*, the FBI at least had enough information to speculate that its New York office had relevant records.  73 F.3d at 389.  Here, because the NSA had no reason to be aware of Lynch's alias, it had no basis even to speculate about that potential lead.  More, Kowalczyk lost despite mentioning New York in his follow-up "appeal" letter.  *Id.* at 388.  Here, ACLJ apparently did not even alert the NSA when it learned of Lynch's alias.  *See* Mot. Hr'g Tr. at 19–20, 42, 51.  Having discovered this lead after sending its original request, ACLJ's path forward was—and remains—clear:  send a second FOIA request.  *See Kowalczyk*, 73 F.3d at 389.

## C.

State did not assert a *Glomar* response for Parts 3 and 6 of ACLJ's request.  As narrowed, these parts seek communications between Power and any NSA employee referencing Trump or the 46 others, as well as any records "sent [or] received by Power" referencing these individuals.  Stein Decl. ¶ 6.  After a search, State released 243 records in whole or in part, "with redactions based on FOIA Exemptions 1, 5, and 6."  *Id.* ¶ 12.  It also withheld nine documents in full.  *Id.* ACLJ contests the agency's partial withholding of 15 documents under Exemption 5.  *Id.* ¶ 13.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  It "incorporates the privileges that the Government may claim when litigating against a private party," including the deliberative process privilege and attorney-client privilege. *Abtew v. DHS*, 808 F.3d 895, 898 (D.C. Cir. 2015).

To qualify for the deliberative process privilege, a document must be both predecisional and deliberative.  *Id.* A document is "predecisional" if it precedes, in time, the decision to which it relates.  *Id.* A document is "deliberative" if it reflects the give-and-take by which a decision is

made. *Id.* at 899.  The privilege encompasses factual material if it is "inextricably intertwined" with deliberative material.  *Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 372 (D.C. Cir. 2005).

The privilege generally protects "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  This protection "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussions among those who make them."  *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (cleaned up).

The attorney-client privilege similarly encourages clients "to be as open and honest as possible with attorneys."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  The privilege is "not limited to communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter."  *Id.*  It also protects "an attorney's written communications to a client."  *Id.*

The 15 documents at issue—all withheld in part—fall into four categories:

1. Email chains discussing substantive edits and comments for speeches by then-Ambassador Power (12 documents; *Vaughn* Items 1, 2, 3, 4, and 6);

2. An email chain containing a discussion of line edits and the content of a draft memorandum for the U.N. Secretary-General (one document; *Vaughn* Item 5);

3. An email chain discussing a human resources matter, strategy about communications with Congress, and the substance of those policy deliberations with Members of Congress (one document; *Vaughn* Item 7); and

4. An email chain discussing potential courses of action related to the protests at Standing
   Rock Indian Reservation (one document; *Vaughn* Item 8).

Stein Decl. ¶ 26.

For all these documents, State invokes the deliberative process privilege. *Id.* ¶¶ 27–29.
For certain redactions in the documents comprising *Vaughn* Items 1 and 2, State also invokes the
attorney-client privilege. *Id.* ¶ 32. The Court finds that State's declarations and *Vaughn* Index
adequately explain why all challenged documents qualify for these privileges. *Id.* ¶¶ 24–33;
Second Stein Decl. ¶¶ 6–24, ECF No. 41-2; Stein Decl. Ex. A at 13–18, ECF No. 37-3. And, for
the most part, ACLJ does not contest these explanations. *See* Pl.'s Cross-Mot. at 10–15; Pl.'s
Reply at 13–15. It does so only for a few documents, but its arguments are unavailing.

**Nos. C06497371 and C06497673** (two of the five documents in *Vaughn* Item 1): These
documents, both dated May 19, 2016, are "email chains [that] discuss substantive edits and
comments on the content of [Power's] upcoming commencement address at Yale University
Class Day on May 22, 2016." Stein Decl. Ex. A at 13. State asserts that the withheld material
"is pre-decisional and deliberative with respect to a final determination on the content and
framing of the proposed speech." *Id.*

ACLJ suggests the deliberative process privilege does not apply to these emails because
they do not discuss "the formation of the speech," but rather "contain the subject line, 'Re: How
much grief,' and appear to discuss a current event." Pl.'s Cross-Mot. at 13. In response, State
explains that this subject line "relates to the content of [Power's] speech at Yale." Second Stein
Decl. ¶ 9. Power was asking the recipient "'[h]ow much grief' the Secretary of State received
for a Trump reference in his speech at Northeastern, as she [was] 'trying to thread [the] needle'
with her upcoming Yale speech." *Id.* (first and third alterations in original). The recipient

replied by providing "feedback regarding possible approaches to the speech." *Id.*  Copies of these redacted emails are in the record, and they bear out the agency's explanation.  Southerland Decl Ex. 1 at 3–4, ECF No. 39-2; Second Stein Decl. Ex. 1 at 20, ECF No. 41-2.  ACLJ does not press the point in its reply brief.  *See* Pl.'s Reply at 13–15.

**No. C06497566** (*Vaughn* Item 3):  This document is an "email chain [that] contains internal deliberations regarding substantive edits and comments on [Power's] speech upon receiving the Henry A. Kissinger Prize for her work in her position as U.S. Ambassador to the United Nations."  Stein Decl. Ex. A at 15.  "These edits and comments relate to the version of the speech that was to be published *after* she had given it at the ceremony," *id.* (emphasis added), and ACLJ believes this makes the document post-decisional, Pl.'s Cross-Mot. at 14.

Not so.  ACLJ relies on *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), which observes that the deliberative process privilege "does not shield documents that simply state or explain a decision the government has already made."  *Id.* at 737.  But the email chain does not "state or explain a decision . . . already made."

Power gave a speech at a ceremony, and the chain contains edits and comments on "the version of the speech that was to be published after she had given it at the ceremony"—so a *different version* of the speech, not the one already given.  Stein Decl. Ex. A at 15.  The chain includes "recommendations for revisions to the original address," so it reflects deliberations about the not-yet-published version.  *Id.*  After the ceremony speech, Power "was substantially redrafting it for a different format (i.e., in text rather than in person) and a different audience (i.e., the public rather than the audience at the . . . ceremony)."  Second Stein Decl. ¶ 13.  Once again, ACLJ does not press the point.  *See* Pl.'s Reply at 13–15.

No. **C06497581** (*Vaughn* Item 5):  This document is an "email chain [that] contains discussion of line edits and the content of a draft memorandum for U.N. Secretary-General Antonio Guterres."  Stein Decl. Ex. A at 16.  ACLJ's objection here, however, concerns not this email chain but an attachment that State withheld in its entirety—the "Guterres Transition Memo _ January 2.docx."  Pl.'s Cross-Mot. at 14.

State describes this attachment as "a draft transition memorandum for the incoming U.N. Secretary-General."  Second Stein Decl. ¶ 19.  It is deliberative, the agency says, because "it makes proposals and recommendations as to the substance of the memorandum."  *Id.*  ACLJ retorts that the attachment's status as a draft "does not make all content within [it] deliberative," but elaborates no further.  Pl.'s Reply at 14.  State has adequately explained why the attachment is deliberative, *see* Second Stein Decl. ¶¶ 19–20, and ACLJ's contrary assertion is merely unsupported speculation.[15]

No. **C06647997** (*Vaughn* Item 7):  This document is an "email chain [that] discusses a human resources matter, strategy regarding communications with Congress, and the substance of those policy deliberations with Members of Congress."  Stein Decl. Ex. A at 17.  These emails issued on August 2 and August 3, 2016, and they "pre-date[] the outreach to Congress."  *Id.*

ACLJ suggests that State's failure to identify when "the outreach to Congress" occurred casts doubt on whether the email chain is predecisional.  Pl.'s Cross-Mot. at 14.  In its supplemental declaration, the agency explains that the withheld material "includes deliberations among multiple State officials regarding strategy for Legislative Branch outreach, including to

---

[15]  After briefing was complete, the Government clarified that State also withheld this attachment in full under Exemption 1.  Notice of Add. Basis for Withholding at 1, ECF No. 45.  Because the Court upholds the withholding of this attachment under Exemption 5, the Court need not consider whether Exemption 1 also applies.

multiple senators, congressmen, committees, and staff, in August 2016 regarding a possible U.N. resolution on nuclear testing." Second Stein Decl. ¶ 21. It reiterates that these deliberations "pre-date[] the outreach." *Id.* While exact dates for the "outreach" would be preferable, State's explanation is still adequate. ACLJ provides no concrete basis for doubting that deliberations among State officials on August 2 and August 3 predated the "August 2016" outreach to Congress. Yet again, ACLJ does not press the point in its reply brief. *See* Pl.'s Reply at 13–15.

ACLJ also notes in passing that the content withheld in this email chain includes "a readout of [a] Moniz-Corker call," but it does not elaborate on why it thinks this withholding is improper. Pl.'s Cross-Mot. at 14. State explains that the readout is "a description of communications with Senator Bob Corker regarding the possible U.N. resolution . . . including discussion of policy issues and priorities around the resolution." Second Stein Decl. ¶ 21. It is deliberative, the agency says, because "it provides opinions on and analysis of potential U.S. courses of actions with respect to the possible U.N. resolution, and it distills the conversation into the points the author considered most important for the recipients of the email." *Id.* This explanation is adequate. *See Montrose Chem. Corp. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974). And ACLJ provides no reason to question it. *See* Pl.'s Cross-Mot. at 14; Pl.'s Reply at 15.

That concludes ACLJ's specific objections to State's withholdings. ACLJ next argues— for all challenged withholdings—that State has shown no "foreseeable harm" that would result from disclosure. Pl.'s Cross-Mot. at 15–16. It cites a recent addition to FOIA, which provides that "[a]n agency shall . . . withhold information . . . only if . . . (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) . . . or . . . (II) the disclosure is prohibited by law." FOIA Improvement Act of

2016, Pub. L. No. 114-185, § 2(1)(D), 130 Stat. 538, 539 (codified at 5 U.S.C. § 552(a)(8)).
State insists it has met this requirement, and the Court agrees.

The agency explains that disclosure of the material withheld—"material containing the details of internal discussions held in the course of formulating a policy or other forms of action"—"could reasonably be expected to chill the open and frank exchange of comments, recommendations, and opinions that occurs between Department officials about sensitive topics." Stein Decl. ¶ 28. This, in turn, "would severely hamper the ability of responsible Department officials to formulate and carry out Executive Branch programs." *Id.*

The agency's supplemental declaration goes into greater detail. For example, it notes that *Vaughn* Items 1, 2, 3, 4, and 6 encompass documents in which State officials "deliberate not only the framing of the Department's position on . . . substantive issues, but [also] the substantive issues themselves," including a "refugee policy" and "efforts to curb the Russian threat." Second Stein Decl. ¶ 16. If these deliberations were disclosed, officials "would be loath to provide the frank assessments or controversial opinions that result in the most effective and informed decision-making, particularly where the public positions relate to high-profile issues." *Id.* ¶ 17.

The foreseeable harm from disclosure is "particularly heightened in the context of foreign affairs, where the U.S. Government's official position" implicates "relationships with other countries." *Id.* Release of "non-final recommendations or opinions on foreign affairs" thus "may cause international public confusion about the United States' stance on these issues." *Id.* Similarly, "release of these preliminary comments . . . could cause harm by providing the public with an erroneous understanding of agency decision-making at the U.S. Mission to the United Nations and among senior Executive Branch officials." *Id.* ¶ 18.

The supplemental declaration goes into similar detail when explaining why disclosure of *Vaughn* Items 5, 7, and 8 would pose harm.  *See id.* ¶¶ 20, 22–24.  The Court finds that, by these detailed explanations, State has fulfilled the terms of 5 U.S.C. § 552(a)(8).  After all, this provision requires only that the agency "reasonably foresee[] that disclosure would harm an interest protected by an exemption described in subsection (b)."  5 U.S.C. § 552(a)(8)(A)(i)(I). State's declarations provide a reasonable basis to think that disclosure of the withheld materials would harm several interests that Exemption 5 protects, such as encouraging candid discussions and guarding against premature disclosure and public confusion.  *See Sears, Roebuck & Co.*, 421 U.S. at 151–53; *Coastal States Gas Corp.*, 617 F.2d at 866.

To be sure, ever since the FOIA Improvement Act was enacted, a debate has raged about what showing the Government must make under § 552(a)(8)(A)(i)(I).  *See, e.g.*, *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 354–55 (D.D.C. 2018).  The parties continue that debate, with ACLJ arguing that the statute requires a heightened showing and the Government disagreeing. *Compare* Pl.'s Cross-Mot. at 15–16, *with* Defs.' Reply at 26–27, ECF No. 41.  The D.C. Circuit has not addressed this debate yet, and the Court need not resolve it either, for "the Government prevails under either approach."  *Cause of Action Inst.*, 330 F. Supp. 3d at 355.  State's explanation of "foreseeable harm" is like—if not more detailed than—other explanations that have been upheld.  *See id.*; *Machado Amadis v. DOJ*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019).

ACLJ has one final argument.  It urges the Court to reject State's efforts at segregating non-exempt from exempt material for the 15 challenged documents.  Pl.'s Cross-Mot. at 11–13. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  The deliberative process privilege ordinarily does not shield factual material, as

distinct from "opinion" material. *See Coastal States Gas Corp.*, 617 F.2d at 867. So, when invoking this privilege, an agency must segregate and disclose any factual information not "inextricably intertwined" with the deliberative material. *See Judicial Watch, Inc.*, 432 F.3d at 372.

ACLJ pounces on this rule and complains that State "conveniently fails to detail whether any information it has withheld is factual, as opposed to opinion." Pl.'s Cross-Mot. at 11. But this misses the mark. As the Government points out, there is no requirement that an agency "attest to a negative," that it is *not* withholding non-exempt material. Defs.' Reply at 19. Instead, State must "demonstrate that all reasonably segregable material has been released." *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002). To show this, agencies can rely on the combination of its declarations and *Vaughn* Index. *Id.* And they "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To overcome this presumption, the requestor must provide a "quantum of evidence." *Id.*

State notes that its withholdings "occasionally contain[] selected factual material intertwined with opinion." Stein Decl. ¶ 31. The agency "has carefully reviewed all of the [challenged] documents . . . and has segregated exempt from non-exempt information where reasonably possible." *Id.* ¶ 34. For each document, it "conducted a line-by-line review . . . and determined that there is no additional meaningful non-exempt information that can be reasonably segregated and released." Stein Decl. Ex. A at 14–18. After its initial review, the agency made a "supplemental production" in which it "released additional information in 11 documents previously released in part and in 4 documents previously withheld in full." Stein Decl. ¶¶ 11, 34. This supplemental production involved some documents that ACLJ challenges. Second

Stein Decl. ¶¶ 9–10.  "Based on these multiple reviews, [State] determined that no further meaningful information can be segregated without disclosing information warranting protection under the law."  Stein Decl. ¶ 34; *see also* Second Stein Decl. ¶ 25.

This explanation provides "reasonable specificity" under the D.C. Circuit's precedents. *See Loving v. DOD*, 550 F.3d 32, 41 (D.C. Cir. 2008); *Johnson*, 310 F.3d at 776.  ACLJ provides no "quantum of evidence" to overcome the presumption that State complied with its obligation. It relies solely on speculation, claiming that "federal agencies, including the State Department, are notorious for attempting to shield non-exempt factual information from disclosure under the guise that it is deliberative."  Pl.'s Cross-Mot. at 12.  More, the agency's supplemental release of once withheld information cuts in its favor.  *Cf. Military Audit Project*, 656 F.2d at 754 ("The release of over two thousand pages of documents after a thorough review suggests to us a stronger, rather than a weaker, basis for the classification of those documents still withheld.").

Finally, for some documents, ACLJ objects to the withholding of search terms and single words.  *See* Pl.'s Cross-Mot. at 13–15 (referencing Nos. C06497371, C06497351, C06497352, C06497581, and C06647997).  But as State explains in reply, it *did* disclose most of these terms and words.  *See* Defs.' Reply at 21 & n.7, 22, 24; Second Stein Decl. ¶¶ 9–10, 19; Second Stein Decl. Ex. 1 at 16–20.  And in any event, an agency need not "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977).  State says that the isolated terms it redacted are inextricably intertwined with exempt material and provide no meaningful content. *See* Defs.' Reply at 25; Second Stein Decl. ¶ 21.  ACLJ provides no evidence casting doubt on these representations.  *See* Pl.'s Reply at 13–15.

In sum, the Court rejects ACLJ's challenges to State's Exemption 5 withholdings.

**IV.**

For these reasons, the Court will grant in part and deny in part the Government's motion for summary judgment and ACLJ's cross-motion.  A separate Order will issue.

Dated:  July 24, 2020                                              TREVOR N. McFADDEN, U.S.D.J.